Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Joseph S. McMillen (SBN 174561) *jm@mckennonlawgroup.com*
Stephanie L. Talavera (SBN 307252) *st@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiff David C. Wynn

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| DAVID C. WYNN,<br><br>             Plaintiff,<br><br>vs.<br><br>SEDGWICK CLAIMS MANAGEMENT SERVICES, INC.; NBCUNIVERSAL MEDIA, LLC; and DOES 1 to 10, inclusive,<br><br>             Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>---<br><br>**COMPLAINT FOR BREACH OF INSURANCE CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**REQUEST FOR JURY TRIAL** |

Case No.:

## **THE PARTIES**

1.     Plaintiff David C. Wynn ("Mr. Wynn") is an individual, who, at all relevant times was, and is, a resident of Los Angeles County, California.

2.     On information and belief, Defendant NBCUniversal Media, LLC, ("NBC") a subsidiary of Comcast Corp. is, and at all relevant times was, a Delaware corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  The activities of the company are directed, controlled and coordinated by its officers and directors from its headquarters in the State of New York.  NBC is, and at all relevant times was, a company validly licensed to conduct business within the State of California and doing business in Los Angeles County, California.

3.     On information and belief, Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick"), is, and at all relevant time was, an Illinois corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Tennessee.  The activities of the company are directed, controlled and coordinated by its high-level officers and directors from its headquarters in the State of Tennessee.  Sedgwick is, and at all relevant times was, an insurance company validly licensed to conduct business within the State of California and doing business in Los Angeles County, California.

4.     Defendants Does 1 through 10, inclusive, are sued by fictitious names because their true name and capacities, whether individual, corporate, associate or otherwise, and/or their responsibility and culpability for the acts alleged herein are unknown to Mr. Wynn at this time.  Mr. Wynn is informed and believes, and on that basis, alleges that each defendant sued herein as "Doe" is responsible in some



1    manner for the acts and events referred to herein.  When their true names, capacities,

2    responsibility and culpability are ascertained, Mr. Wynn will seek leave of this

3    Court to amend the Complaint as appropriate.

4

5    5.    Mr. Wynn is informed and believes, and on that basis, alleges that at all

6    times mentioned herein, each of the fictitiously named defendants was the agent,

7    representative, co-conspirator, successor-in-interest, assignee or employee of each

8    remaining defendant, and in doing the things alleged herein was acting within the

9    course and scope of such agency, representation, conspiracy, assignment and

10   employment.

11

12                      **JURISDICTION AND VENUE**

13

14   6.    This Court has jurisdiction pursuant to 28 U.S.C. section 1332 because

15   Mr. Wynn, NBC and Sedgwick are citizens of different states (California and

16   Delaware, New York, Illinois and Tennessee).  In addition, the amount in

17   controversy exceeds $75,000, exclusive of interest and costs.

18

19   7.    Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b)(2)

20   because a substantial part of the events or omissions giving rise to this lawsuit

21   occurred in this District.  The insurance contract at issue, and Defendants' liability

22   to Mr. Wynn, arose in Los Angeles County, California where Mr. Wynn resides.

23   Defendants breached the contract in this District by failing to pay Mr. Wynn the

24   disability benefits due him, which he would have received at his residence in Santa

25   Clarita had Defendants paid them, and by repeatedly sending him denial letters to

26   his home in Santa Clarita.  Defendants conducted extensive business in California,

27   including Los Angeles County, during the relevant times, and issued the subject

28   disability policy while Mr. Wynn was residing in Los Angeles County.

Case No.:



## GENERAL FACTS / ALLEGATIONS

8.      NBC established a short-term disability benefits policy (the "Policy") to provide a substitute income to an eligible employee in the unfortunate event that he or she should become disabled within the meaning of the Policy.  The relevant terms of the Policy, as outlined in the Policy effective January 1, 2016, are quoted in full below.

9.      NBC provides short-term "Disability" coverage to eligible employees who suffer an "Injury" or "Illness" lasting longer than the benefit waiting period of seven consecutive days.  Under the terms of the Policy, "Disability" means the inability to perform your "Own Job."  Illness means any sickness, disease or pregnancy, including complication of pregnancy.  Injury "means bodily impairment resulting directly from an accident and independently of all other causes."

10.      Under the terms of the Policy, "Own Job" means

[t]he activity and essential functions you regularly perform and that provide your primary source of earned income.  It is not limited to the specific position you hold with NBCUniversal [sic] It may be a similar activity that could be performed with NBCUniversal or any other employer.

11.      If the disability is based on a primary behavioral or mental health-related disability, eligibility for short-term disability requires that care involve an initial mental health evaluation and active, ongoing appropriate care and treatment by a licensed, registered behavioral or mental health professional.  An initial mental health evaluation is unnecessary if the employee is currently undergoing treatment with a licensed behavioral health professional; however, the licensed behavioral health professional should provide all of the employee's current clinical records,



1   along with an attending provider statement ("APS") outlining his or her diagnosis,

2   symptoms, limitations, treatment plan and return to work goals.

3

4   12.   Mr. Wynn met, and still meets, the eligibility requirements for short-

5   term disability benefits under the Policy because he suffers from debilitating mental

6   illnesses that prevent him from leaving the house, much less performing the duties

7   required of his position at NBC.

8

9   13.   In or around November 2014, Mr. Wynn began working for NBC, a

10  publicly-traded Fortune 500 company.  Mr. Wynn worked at NBC's office in

11  Universal City as a Technical Support Analyst.  In his position, Mr. Wynn provided

12  workplace support, including installing new software, resolving related issues,

13  upgrading, patching (a small piece of software designed to update a computer

14  program) and answering broad questions across most workplace devices, including

15  personal computers ("PCs") and Macintosh devices.  As a Technical Support

16  Analyst, Mr. Wynn escalated high priority issues and acted as the liaison until the

17  problem was solved.  Mr. Wynn's position also required that he brainstorm

18  workplace solutions and proposals, conduct PC refresh services, assist with small

19  office moves, troubleshoot across the organization, recommend new technologies as

20  necessary and understand and provide "soft support" of the Business Engagement

21  Teams systems.

22

23  14.   To be a Technical Support Analyst at NBC required certain

24  qualifications, including a bachelor's degree or equivalent training or experience

25  and three or more years of professional corporate experience.  In addition to such

26  experience, Mr. Wynn also had to be practiced in providing direct, onsite support

27  using all devices, demonstrate strong customer service attitude and demeanor and

28  work well under pressure in time sensitive environments, with occasional overtime.

Case No.:



As to general skills, a Technical Support Analyst was to have outstanding analytical skills, strong oral and written communication skills and be a team player.

15. Mr. Wynn's disability began to interfere with his ability to work in late October 2016. Mr. Wynn suffers from Bipolar 1 Disorder (F31.9) and Generalized Anxiety Disorder ("GAD") (F41.1). Bipolar 1 Disorder is a major affective disorder marked by severe mood swings (manic or major depressive episodes). As the Diagnosis Code Manual explains, this is a serious mental illness and people who have it experience alternating periods of mania and depression. If left untreated, it can damage relationships, lead to poor job or school performance and even suicide. GAD is a condition marked by excessive worry and feelings of fear, dread and uneasiness that last six months or longer. It is characterized by excessive and uncontrollable worry accompanied by restlessness, fatigue, inability to concentrate, irritability, muscle tension and/or sleep disturbance that lasts for at least six months, obsessive fear and anxiety, imagined danger, vulnerability or uncertainty. Such feelings of fear, dread and apprehension may be accompanied by sweating and a rapid heart rate. As the Diagnosis Code Manual explains, fear and anxiety are a part of life and can be useful when a situation demands it, but for people suffering from GAD, anxiety does not go away, gets worse over time and is so severe that it may cause chest pains, nightmares and a fear of leaving the house.

16. As part of his treatment, Mr. Wynn takes numerous medications, which offer further evidence in support of his disability. Those medications include the following: Buspirone (Buspar), an anti-anxiety medicine that affects chemicals in the brain that may be unbalanced in people with anxiety to treat anxiety's symptoms, including fear, tension, irritability, dizziness, pounding heartbeat and other physical symptoms; Quetiapine (Seroquel), an antipsychotic medicine which works by changing the actions of chemicals in the brain and can be used to treat



1  bipolar disorder; Clonazepam (Klonopin), a benzodiazepine, which affects
2  chemicals in the brain that may be imbalanced and is also used as a seizure medicine
3  and anti-epileptic drug; Sertraline (Zoloft), an antidepressant in the group of drugs
4  called selective serotonin reuptake inhibitors or SSRIs and is thought to positively
5  affect communication between nerve cells in the central nervous system and restore
6  chemical balance; Duloxetine (Cymbalta), a selective serotonin and norepinephrine
7  reuptake inhibitor antidepressant or SSNRI, thought to positively affect
8  communication between nerve cells in the central nervous system and restore
9  chemical balance in the brain; Prazosin (Minipress), an alpha-adrenergic blocker
10 that relaxes your veins and arteries so blood can more easily pass through and may
11 be used to treat hypertension (or high blood pressure); and Gabapentin (Neurontin),
12 an anti-epileptic medication, also called an anticonvulsant that affects chemicals and
13 nerves in the body that are involved in causing seizures and some types of pain.
14
15     17.    Mr. Wynn's medications also have the following, serious side effects:
16 Buspirone (Buspar) may cause restlessness, nervousness or unusual excitement;
17 Quetiapine (Seroquel), a powerful antipsychotic medication, may have serious side
18 effects including, trouble with movement, dizziness, weakness, increased appetite or
19 weight gain, sore throat, dry mouth, nausea, vomiting, stomach pain, and
20 constipation; Clonazepam (Klonopin) common side effects include feeling tired,
21 depressed, drowsiness, dizziness, memory problems and problems with balance or
22 coordination; Sertraline (Zoloft) common side effects include decreased sexual
23 desire or ability and failure to discharge semen; Duloxetine (Cymbalta) common
24 side effects include asthenia (abnormal physical weakness or lack of energy),
25 constipation diarrhea, dizziness, drowsiness, fatigue, hypersomnia (excessive
26 sleepiness), insomnia (inability to sleep), nausea, sedation, headache and xerostomia
27 (dryness in the mouth); Prazosin (Minipress) common side effects include dizziness
28 and sudden fainting; and Gabapentin (Neurontin) common side effects include

Case No.:



1    ataxia (loss of full control of bodily movements), dizziness, drowsiness, fatigue,
2    fever, nystagmus (a vision condition in which the eyes make repetitive, uncontrolled
3    movements) and viral infection.

4

5    18.    On October 13, 2016, Mr. Wynn presented to Dr. Syed Tahir Rizvi
6    with anxiety, depression, panic attacks, a mood disorder and an eating disorder.  Mr.
7    Wynn reported symptoms of a depressed and irritable mood, with decreased interest
8    and pleasure, psychomotor retardation (slowing down of thought and reduction in
9    physical movements), decreased concentration, energy, fatigue and recurrent
10   thoughts of death and anhedonia (inability to feel pleasure).  As to his anxiety, Mr.
11   Wynn reported symptoms of excessive worry, anxiety and difficulty controlling that
12   worry.  He also reported feelings of restlessness, feeling on edge, easily fatigued,
13   difficulty concentrating, mind going blank, irritability, muscle tension, sleep
14   disturbance and panic.

15

16   19.    Based on this visit, Dr. Rizvi increased or adjusted several of Mr.
17   Wynn's medications and recommended a follow-up visit and phone or email update
18   in three weeks as necessary.  However, Mr. Wynn's condition did not improve.

19

20   20.    On October 24, 2016, Dr. Rizvi wrote a letter to Sedgwick, on Mr.
21   Wynn's behalf, explaining his diagnoses of GAD and Bipolar Disorder, as well as
22   the numerous medications prescribed as part of his treatment.

23

24   21.    On October 25, 2016, Sedgwick wrote to Mr. Wynn informing him of
25   the required action for his short-term disability claim, due on or before November
26   14, 2016, including a completed authorization for release of medical information
27   and a completed APS.

28

Case No.:



22.     On October 26, 2016, Dr. Rizvi provided Mr. Wynn with a work status report, which referenced his diagnosis with GAD and Bipolar Disorder and ordered Mr. Wynn off work from October 25, 2016 through November 23, 2016.

23.     On October 30, 2016, Mr. Wynn submitted a claim for disability to the California Employment Development Department ("EDD"), listing his disability from work beginning on October 25, 2016.  EDD approved his claim.

24.     In a letter dated November 15, 2016, Mary Enfield, Disability Representative for Sedgwick, denied Mr. Wynn's claim for benefits because, according to Sedgwick, the medical information provided did not support his inability to perform his own job.  Sedgwick ignored the work status note from Dr. Rizvi, specifically ordering Mr. Wynn off work from at least October 25, 2016 through November 23, 2016.

25.     In an APS, and accompanying work status report, dated November 22, 2016, Dr. Rizvi informed Sedgwick that Mr. Wynn's disability prevented him from performing the duties of his occupation at least through January 22, 2017.

26.     On or around December 6, 2016, Mr. Wynn appealed Sedgwick's denial.  Attached to that appeal was a Continuing Disability Review Report from the Social Security Administration ("SSA"), the independent government entity responsible for reviewing claims for Social Security Disability Insurance ("SSDI") benefits.  On the form, Mr. Wynn listed the debilitating symptoms of his conditions, including violent mood swings, self-harm, burning, intrusive violent thoughts, inability to concentrate, periods of mania and depression, generalized anxiety, immobilizing panic attacks, shakes, tremors and fear of massacre.  Mr. Wynn also

Case No.:



listed the names of the medications he takes for his conditions, including those listed above: Buspar, Seroquel, Klonopin, Zoloft, Cymbalta, Neurontin and Minipress.

27.    On the SSA Continuing Disability Review Report, Mr. Wynn described the damaging impact his disorders have on his daily life.  Unlike people without GAD or Bipolar 1 Disorder, Mr. Wynn struggles to adequately, consistently and independently perform otherwise routine activities for self-care, such as changing his clothes, bathing, taking his medications, shopping and managing his finances. For example, when using public transportation or shopping at a public market, Mr. Wynn experiences debilitating panic attacks, with a real fear of imminent harm or death.  Mr. Wynn's disability also causes immobilizing physical symptoms, resulting in a difficulty using his arms, hands and fingers.  At times, his symptoms are so severe that he experiences weak tremors, shaky involuntary tics and restlessness.  Even further, Mr. Wynn's constant state of panic and fear also affect his self-esteem and ability to concentrate, as he has difficulty remembering in the short term, retaining directions, staying focused and getting along with people.

28.    In early December 2016, Sedgwick acknowledged receipt of Mr. Wynn's request for review, as well as the attached SSA Continuing Disability Review Report.

29.    On December 15, 2016, Mr. Wynn again saw Dr. Rizvi for treatment. Several days later, Dr. Rizvi wrote yet another letter to Sedgwick certifying Mr. Wynn's diagnoses of Bipolar 1 Disorder and GAD.  In this new, more detailed letter, Dr. Rizvi also discussed Mr. Wynn's specific symptoms and how those symptoms prevent him from performing the duties of his, or any other occupation. As Dr. Rizvi described, Mr. Wynn experiences constant, uncontrollable shakes, tremors, hot and cold sweats, uncontrollable involuntary movement, outbursts of

Case No.:



anger, general mood liability and emotional dysregulation.  He also experiences anxiety and panic attacks caused by his GAD, and his panic attacks make it hard for him to breath, his muscles, limbs and fingers cramp and are unable to open, he sweats profusely and has strong feelings that he is going to die.  Because of his conditions, he has impaired concentration and short-term memory, which would result in him forgetting where he is going and what he is doing.

30.     Mr. Wynn continued to receive regular treatment for his conditions, following up with providers for group and individualized therapy on December 20, 2016, and December 22, 2016.

31.      On January 9, 2017, Mr. Wynn again saw Dr. Rizvi and he provided an updated work status report, again extending Mr. Wynn's leave to February 12, 2017.

32.     On January 18, 2017, Sedgwick improperly denied Mr. Wynn's claim for disability benefits on appeal because, according to Sedgwick, "the medical information in the file [did] not support [his] inability to perform [his] own job".  In its denial, Sedgwick relied on a cursory, biased, peer review opinion by a physician, Nasreen Razack-Malik, M.D, who opined that "**having a *depressed mood state* does not translate into the inability to do a familiar job task and role**."  (Emphasis added.)

33.     Sedgwick does not address, or even attempt to explain, the fact that Mr. Wynn's condition is far more severe than a "depressed mood state".  Specifically, Sedgwick ignored overwhelming evidence to the contrary, including the following:



-10-



1       ▪   Mr. Wynn's consistent treatment with Dr. Rizvi and other medical and

2         psychiatric professionals;

3

4       ▪   Mr. Wynn's history of forced hospitalization;

5

6       ▪   Mr. Wynn's numerous, serious medications used to manage his disorders,

7         including an antipsychotic[1] medication;

8

9       ▪   Mr. Wynn's physical symptoms as a result of his disorders, including tremors,

10        uncontrollable shakes, hot and cold sweats, uncontrollable involuntary

11        movement, anger outbursts, mood liability, emotional dysregulation,

12        difficulty breathing, seizing in his muscles, limbs and fingers, sweating

13        profusely and strong feelings of imminent death, all of which directly affect

14        his ability to work; and

15

16       ▪   a similar determination of disability made by an independent state agency

17        (California EDD).

18

19         34.     Since Sedgwick's cursory and improper denial, the SSA approved Mr.

20 Wynn's claim for SSDI benefits and Dr. Rizvi extended Mr. Wynn's leave from

21 work through July 20, 2017.

22

23

24

25

26



27 _____

[1] Antipsychotics are major tranquilizers or neuroleptics (used to treat seizures in
28 those who suffer from epilepsy), and are a class of medication primarily used to
treat psychosis, such as schizophrenia and bipolar disorder.

Case No.: 

# **FIRST CLAIM FOR RELIEF**

For Breach of Contract

(Against Sedgwick, NBC and Does 1 to 10)

35.     Mr. Wynn incorporates by reference each of the foregoing paragraphs of this Complaint, as though fully set forth herein.

36.     Mr. Wynn entered a valid and binding written contract, *i.e.*, the Policy, by Mr. Wynn being an insured under that group insurance Policy.  The Policy obligated Defendants to, among other things, pay Mr. Wynn disability benefits should he become disabled within the meaning of the Policy.

37.     At all relevant times, Mr. Wynn has been, and continues to be, disabled within the meaning of the Policy.

38.     Defendants improperly and incorrectly denied Mr. Wynn's claim for disability benefits due and owing to him under the Policy.

39.     Mr. Wynn fulfilled every condition and has duly performed each and every obligation that he was required to perform under the terms of the Policy, except those that were excused or waived, and is and at all relevant times has been entitled to payment of disability benefits under the terms and conditions of the Policy.

40.     Defendants breached their obligations to Mr. Wynn under the Policy by failing to fulfill their obligations thereunder, including but not limited to, the obligation to pay disability benefits due under the Policy and by otherwise wrongfully refusing payment of Mr. Wynn's Policy benefits.

Case No.:



41.     Defendants also breached their contract with Mr. Wynn by ignoring the ample medical evidence that demonstrates his entitlement to disability benefits from October 25, 2016 forward.

42.     As a direct and proximate result of Defendants' conduct as alleged herein, Mr. Wynn has suffered and will continue to suffer monetary and non-monetary damages in an amount to be determined at trial, but which exceeds $75,000, including but not limited to loss of his disability insurance benefits, pre-judgment interest on those benefits at the legal rate, consequential and emotional distress damages.

43.     Mr. Wynn alleges all of the same conduct against Does 1 through 10 as it does against named Defendants in this First Cause of Action for Breach of Contract and in this Complaint.

**SECOND CLAIM FOR RELIEF**

For Breach of the Implied Covenant of Good Faith and Fair Dealing

(Against Sedgwick, NBC and Does 1 to 10)

44.     Mr. Wynn incorporates by reference each of the foregoing paragraphs of this Complaint, as though fully set forth herein.

45.     Each and every agreement in California, including the Policy, contains an implied covenant of good faith and fair dealing.  That covenant required Defendants to, among other things, refrain from acting in any way that could jeopardize, impair or interfere with the rights of Mr. Wynn to receive the benefits of the contract, including his disability benefits; properly, which includes a thorough and adequate investigate of the claim and all potential bases for coverage; not

Case No.:



1  withhold or delay paying Policy benefits unreasonably or without proper cause; act

2  reasonably in handling, processing and paying the claim considering the totality of

3  the circumstances; and give at least as much consideration to the insured's interests

4  as it does to its own.

5

6       46.    Defendants' denial of Mr. Wynn's claim for payment of disability

7  benefits was unreasonable and without proper cause for all of the reasons discussed

8  above.  Defendants breached the implied covenant of good faith and fair dealing by

9  the following conduct, among other conduct:

10

11         ▪   Defendants unreasonably and without proper cause failed to reimburse

12             Mr. Wynn for his benefits due under the Policy.  They paid him

13             nothing and unreasonably denied the claim in full.

14

15         ▪   Defendants unreasonably and without proper cause delayed paying Mr.

16             Wynn the benefits due him under the Policy.  They have paid nothing

17             and continue to delay.

18

19         ▪   Defendants failed to credit the overwhelming medical evidence in their

20             file and available through simple investigation (which is their duty)

21             proving Mr. Wynn was and is disabled within the meaning of the

22             Policy.  Rather than conducting a good faith investigation of his claim

23             and reaching the proper and reasonable conclusion that Mr. Wynn was

24             and remains disabled, Defendants decided to deny his claim based on a

25             biased peer review while ignoring multiple independent decisions to the

26             contrary.  Defendants had no reasonable basis to deny the claim and

27             knew it.

28

- ▪ Defendants failed to conduct a thorough investigation and thus breached the implied covenant, *see Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir. 2001), as evidenced by the above-described conduct and also because it: (1) failed to interview necessary witnesses, *see Downey Sav. & Loan Ass'n v. Ohio Cas. Ins. Co.*, 189 Cal.App.3d 1072, 1084 (1987); (2) failed to consult with medical experts as was appropriate in this case, instead unreasonably opting to rely on a purely "paper review", *see Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 724 (2007); and (3) failed to investigate beyond facts and coverage theories asserted by the insured, *see Jordan v. Allstate Ins. Co.*, 148 Cal.App.4th 1062, 1072 (2007) (insurer must "fully inquire into possible bases that might support the insured's claim"), among other things.

- ▪ Defendants conducted a biased, inadequate investigation and factual determination and thus breached the implied covenant as evidenced by the above-described conduct and also because they: (1) focused on facts purportedly justifying denying the claim, ignored or otherwise failed to pursue evidence that supported the claim, and failed to utilize objective standards in making its claims decisions, *see Wilson, supra*, 42 Cal.4th at 724; (2) conducted a purely "paper review" of Mr. Wynn's medical records instead of having an independent medical examination done and (3) relied upon a peer review that ignored evidence in the medical records and viewed it in a light most favorable to the insurer rather than the insured, *see Brehm v. 21st Century Ins. Co.*, 166 Cal.App.4th 1225, 1239–40 (2008) (retaining biased doctor to prepare a report that falsely minimized insured's injuries constitutes bad faith).

-15-

Case No.:



1

2       ▪   Defendants failed to give Mr. Wynn's interests at least as much

3           consideration as its own interests and thus breached the implied

4           covenant.  *See Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 818

5           (1979).

6

7       ▪   Defendants also completely failed to address why their decision

8           differed from determinations of disability by two independent

9           government agencies: California's EDD and the SSA.

10

11          47.    Defendant's unreasonable conduct, including denying the claim

12   without proper cause and without an adequate investigation, caused Mr. Wynn to

13   suffer emotional and financial distress, already precarious given his known

14   conditions.  He struggled to complete proper treatment while also dealing with the

15   stress of inferior income.  Yet, Defendants unreasonably denied his claim when he

16   needed the money to support himself, causing him additional worry, anxiety, mental

17   anguish and serious emotional distress.

18

19          48.    As a proximate result of Defendants' unreasonable claims handling and

20   decision to deny Mr. Wynn disability benefits, he had to retain lawyers to represent

21   him.  He has incurred attorneys' fees and costs, and will continue to do so, to file

22   this litigation and otherwise pursue the disability benefits he is entitled to receive

23   from Defendants under the Policy, but which they have unreasonably refused to pay.

24

25          49.    Defendants' conduct, as alleged above, was undertaken with a

26   malicious intent of depriving Mr. Wynn of his legal right to disability insurance

27   proceeds due under the Policy and otherwise causing him injury.  The acts were

28   despicable, malicious, oppressive and subjected Mr. Wynn to a cruel and unjust

-16-

Case No.:



1    hardship in conscious disregard of his rights, so as to justify an award of exemplary
2    and punitive damages in an amount to be proven at trial.

3

4    50.    Defendants' officers, directors and/or managing agents were either
5    personally involved in the reprehensible conduct warranting punitive damages,
6    and/or they authorized or ratified the conduct of its employees.

7

8    51.    As a direct and proximate result of Defendants' conduct as alleged
9    herein, Mr. Wynn has suffered and will continue to suffer monetary and non-
10   monetary damages, in an amount to be determined at trial, but which exceed
11   $75,000, including but not limited to, loss of his disability insurance benefits, pre-
12   judgment interest on those benefits at the legal rate, consequential damages,
13   emotional distress damages, and attorneys' fees, costs and expenses incurred
14   pursuing Policy benefits under *Brandt v. Superior Court*, 37 Cal.3d 813 (1985) and
15   its progeny.

16

17   52.    Defendant alleges all of the same conduct against Defendants Does 1
18   through 10 as it does against named Defendants in this Second Cause of Action and
19   in this Complaint.

20

21                                   **<u>PRAYER</u>**

22

23   WHEREFORE, Mr. Wynn prays for judgment as follows:
24          1.  For past due and future benefits due under the Policy;
25          2.  For compensatory and consequential damages;
26          3.  For emotional distress damages;
27          4.  For punitive damages;
28          5.  For pre-judgment and post-judgment interest;



1       6.  For attorneys' fees and costs of suit; and

2       7.  For such other and further relief as the Court deems just and proper.

3

4  Dated:  June 26, 2017              MCKENNON LAW GROUP

5

6                         By:                          

                               ROBERT J. McKENNON

7                             JOSEPH S. McMILLEN

                             STEPHANIE L. TALAVERA

8                             Attorneys for Plaintiff David C.

                             Wynn

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1

## REQUEST FOR JURY TRIAL

2

3           Plaintiff requests a trial by jury.

4

5      Dated:  June 26, 2017                    McKENNON LAW GROUP

6

7                                          By: _____
                                               ROBERT J. McKENNON
8                                              JOSEPH S. McMILLEN
                                               STEPHANIE L. TALAVERA
9                                              Attorneys for Plaintiff David C.
                                               Wynn
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.:



CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com

I hereby certify that on Click here to enter a date., I served the foregoing documents described as: XXXXXREQUEST for jury trial on the interested parties as follows:

Attorneys for Defendant
☒ ECF Participant

☒   **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.  I served those parties who are not registered participants of the ECF System as indicated below.

☐   I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐   **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐   **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business.  The transmission was reported as complete, without error.

☐   **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the Unites States of America and the State of California that the above is true and correct.  Executed at Newport Beach, California on Click here to enter a date..

NAME:

_____
(Signature)

Case No.: